**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| LAUDER, INC. d/b/a HOUSTON | § | |
| TRIBUNE AND HEIGHTS TRIBUNE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-3223 |
| | § | |
| CITY OF HOUSTON, TEXAS, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION ENTERING**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a First Amendment challenge to a newsrack ordinance enacted by the City of Houston in 2007. The ordinance requires newsracks on the City's rights-of-way to meet certain material, size, and placement standards and requires publishers using newsracks to pay a permit fee. Lauder, Inc., the plaintiff, publishes a free monthly newspaper funded almost entirely by advertisements. Lauder uses newsracks to distribute the paper. Lauder alleges that the ordinance violates the First Amendment because, among other reasons, it was not based on an established record of specific problems, it imposed detailed requirements without allowing City officials discretion to deviate from them, and it was not sufficiently tailored to the problems it was intended to address. The City asserts that the ordinance was carefully drawn; was adopted after hearing from many of those affected, who were given opportunities to express their concerns; and was modeled after similar ordinances enacted in other municipalities.

This court held an evidentiary hearing in 2008 and denied Lauder's application for a temporary restraining order. The parties conducted discovery and this court held a two-day bench

trial.  As explained in detail below, this court finds and concludes, based on the pleadings, the evidence, and the applicable authorities, that Lauder's First Amendment challenge to the City's newsrack ordinance fails as a matter of law.

## I.   FINDINGS OF FACT

### A.   Background

On February 14, 2007, the Houston City Council passed, and the Mayor signed, ordinance number 2007-225.  (Docket Entry No. 44, Ex. A at 15).  Before that date, the City's ordinance regulating newsracks, which was enacted in 1976, stated as follows:

> A person may sell and/or install any nonelectrical apparatuses for the sale of daily or weekly newspapers on sidewalks, or other public property or property dedicated to public use provided, it shall be unlawful for any person to install any apparatus used for the sale of newspapers where such apparatus will impede or interfere with the free passage of persons on sidewalks or other public property.  The permission granted by this section shall apply to the extent of the city's right, title and interest only.

(Def.'s Ex. 4).

The 2007 ordinance was more specific and detailed.  It began by stating the reasons for the new regulation:

> WHEREAS, the uncontrolled placement and maintenance of newsracks in public rights-of-way presents a danger to the safety and welfare of persons using such rights-of-way, including pedestrians, persons entering or exiting vehicles and buildings, and persons performing essential utility, traffic control, and emergency services; and

> WHEREAS, newsracks located so as to cause a danger to persons using public rights-of-way, and unsightly newsracks located therein, such as newsracks that are poorly maintained or that have been defaced with graffiti, constitute public nuisances; and

2

WHEREAS, the City Council finds and declares that regulating the placement, appearance, size and servicing of newsracks on public rights-of-way is necessary to promote the public health, general welfare, and safety of persons using public rights-of-way, and to foster the aesthetics of the City . . . .

(*Id.* at 1).

The 2007 ordinance requires a publisher who wants to distribute publications in a newsrack on a public right-of-way to obtain a permit and decal from the City.  (*Id.* § 7, § 40-452).  To obtain a permit, each publisher must submit an application setting out contact information; the number of newsracks and a description of the location for each one; a description of each newsrack, including dimensions, signage, and whether it has a coin-operated mechanism; and the name and frequency of the publication to be placed in the newsrack.  (*Id.* § 40-453(a)).  The City's parking management division "shall" issue, within ten business days after the application is filed, a single permit that covers all that publication's newsracks meeting the ordinance standards.  (*Id.* § 40-453(c)).  The permits are valid for three years.  (*Id.* § 40-453(d)).  The publisher must also obtain a decal for each newsrack.  The permit application fee is $300 per publication and the decal fee is $5 per newsrack.  (*Id.* § 40-453(e)).  The publisher can renew a permit before expiration for a fee of $5 per newsrack.  (*Id.* § 40-453(g)).  The City can require a publisher to replace decals that have become worn, faded, defaced, or missing, at a cost of $1 per replacement decal.  (*Id.* § 40-453(f)).

If a permit application is denied in whole or in part, the applicant must be notified within ten business days by certified mail or e-mail and the City must explain the reasons for the denial.  (*Id.* § 40-453(i)).  The applicant has ten business days after receiving the denial to revise and resubmit the application or submit a written request for an appeal.  (*Id.*).  If an appeal is requested, a hearing examiner must conduct a hearing within thirty days.  (*Id.* § 40-453(k)).  Written notice of the time

3

and place of the hearing must be provided no less than ten business days before the hearing.  (*Id.*).

The hearing examiner must issue a written decision within fifteen business days after the hearing.

(*Id.*).  The hearing examiner's decision on the appeal is final.  (*Id.*).

The ordinance imposes maintenance and display requirements on a publisher's newsracks.

The requirements include that the newsracks be "in a neat and clean condition and in good repair

at all times" and "constructed, installed, and maintained in a safe and secure condition."  (*Id.* § 40-

454 (a)(1), (a)(2)).  The ordinance limits newsrack size to "a height of not less than 36 inches and

not more than 54 inches (including the base); a width of not less than 15 inches and not more than

25 inches; and a depth of not less than 12 inches and not more than 21 inches."[1]  (*Id.* § 40-455(a)).

The ordinance requires newsracks to "be manufactured from 20-gauge or thicker zinc coated steel."

(*Id.* § 40-455 (b)(1)).  A coin-operated newsrack must weigh no less than eighty pounds when

empty, excluding the base; no-charge newsracks must weigh no less than fifty pounds when empty,

excluding the base.  (*Id.* § 40-455 (b)(4)).  The ordinance requires both types of newsracks to be

attached to a concrete base or base and pedestal with a net weight of not less than 95 pounds.  (*Id.*

§ 40-455 (b)(5)).  The concrete base must measure 23 inches from front to back, not extend more

than 1.5 inches beyond the side of the newsrack bottom, measure 3 inches high, and not be decorated

or colored.  (*Id.*).  The ordinance imposes other requirements on windows, handles, and springs.  (*Id.*

§ 40-455 (b)(6)–(8)).  Finally, the ordinance requires that every newsrack be painted a specified

dark-green color.  (*Id.* § 40-455(b)(9)).

The ordinance restricts the placement and location of the newsracks.  A newsrack cannot be

placed where it "[e]ndagers public safety"; "[i]nterferes with public utility, public transportation,

---

[1]    As noted below, the City later amended the height requirement.

4

or other governmental use"; or "interferes with or impedes: a. Pedestrian or vehicular traffic; b. Entry or exit from a residence or business; c. access to a legally parked or stopped vehicle; d. Use of a traffic sign or signal, emergency call box, transit shelter, bus stop, elevator, mailbox, or other public service; or e. Access to use of a delivery area or loading zone." (*Id.* § 40-456(a)).  Other requirements include how much space a group of newsracks can occupy, how close the group can be to other newsracks, and how the newsracks must be placed. (*Id.* § 40-456(b)). Special requirements are imposed for newsracks within the central business district, including distances to the curb and the amount of clear pedestrian passage space. (*Id.* § 40-456(c)).

The ordinance allows the City to seize and remove noncompliant newsracks. (*Id.* § 40-458). If a newsrack has no permit, the City can seize that newsrack. (*Id.* § 40-458(a)(1)). If the newsrack has a permit but does not comply with the ordinance, the City must provide the person responsible for the newsrack's installation and maintenance with notice and ten business days to remedy the violation or request a hearing to contest the seizure. (*Id.* § 40-458(b)). The ordinance provides deadlines for the hearing officer to hold a hearing and issue a written decision. (*Id.* § 40-458(d)–(f)). If the violation is not remedied within ten days after notice of the hearing officer's written decision, or if the permitee fails to ask for a hearing within ten days, the City may seize the newsrack. (*Id.* § 40-458(a)).

The maintenance, display, size, and design provisions were effective immediately for new newsracks placed in a public right-of-way. The other ordinance requirements had to be met by December 31, 2007 for newsracks inside the central business district, by December 31, 2008 for newsracks outside the central business district but within the area defined by an interstate that provides a large "loop" around the City (the "I-610 loop"), and by December 31, 2009 for newsracks

5

outside the I-610 loop.  (*Id.* § 8(a)).  For existing newsracks, the effective date within the central business district was December 31, 2007, with certain provisions, such as the color requirement, not taking effect until December 31, 2008.  (*Id.* § 8(b)).  For existing newsracks located outside the central business district, the effective date for all ordinance provisions was December 31, 2008.  (*Id.* § 8(c)).

On May 2, 2007, the City amended the ordinance to make it apply to all newsracks outside the central business district on December 31, 2008.  (Docket Entry No. 44, Ex. B, Ordinance No. 2007-537 at § 1).  On August 29, 2007, the City again amended the ordinance to change the size requirements in § 40-455(a) to exclude the base from the calculation of the newsrack height.  (*Id.*, Ex. C, Ordinance No. 2007-984 at § 1).

Before enacting the 2007 ordinance, the City Council's Quality of Life Committee held approximately sixteen meetings on the proposed regulations.  (Def.'s Ex. 4).  The Committee considered numerous issues, including the geographic area the ordinance would cover, the need to protect the accessibility of public rights-of-way for pedestrians generally and for individuals with disabilities in particular, what size and dimensions the newsracks should be, the type of signage on the newsracks, what color should be used, and what materials should be used.  The Committee members' notes and the video recordings of the hearings are in the record.  They show that City staff and Committee members heard from the City's lawyers, who described approaches used in other cities that regulated newsracks and the First Amendment limits on such regulations.  City Council member and committee chair Pam Holm repeatedly emphasized the need to balance the City's interest in safety and aesthetics with the publishers' interest in reaching readers.  In addition to Holm, other Council members, City staff, and  members of the public—primarily property owners,

community advocates, and representatives of newspaper publishers—attended the hearings and commented on the proposed ordinance.  Property owners and community advocates offered some proposals that were more restrictive than the proposed ordinance.  Representatives of different publishers criticized the scope of the proposed ordinance.  The publishers included representatives of major publications, such as the *Houston Chronicle* and *USA Today*, as well as smaller free publications like Lauder's, including *Rumbo* and *El Dia*, both Spanish-language publications.  Mark Rome, who spoke on behalf of *Rumbo*, was particularly persistent in voicing concerns on behalf of smaller publications distributed mostly outside the central business district.  Rome highlighted the costs of compliance for smaller publications and the importance to these publications that they be easily seen by potential readers.

Sharon Lauder, who owns and operates Lauder, Inc., testified that she first learned about the ordinance from an article in the *Houston Chronicle* soon after the ordinance was enacted on February 14, 2007.  Although Ms. Lauder testified that she had no information about the newsrack ordinance until after its passage, this court finds that the City made extensive and successful efforts to provide notice to, and hear from, members of the public and in particular from newspaper publishers before the ordinance was enacted.  Representatives of the *Houston Press* and *Rumbo* testified that the City solicited comments.  Rome testified that he took two City staff members around Houston to demonstrate some of the problems smaller publications would face.

The Committee responded to many of the criticisms and suggestions.  After some of the publishers expressed concerns about the costs of complying with the proposed ordinance, and several Council members  stated their concern that small publications would not be able to afford prompt compliance, Holm and other Committee members asked the publishers to provide specific

7

information about costs and how the proposed ordinance might be changed to reduce that burden. The Council later modified the proposed ordinance to provide staggered effective dates for different areas of the City.  As revised, the ordinance would first become effective in the central business district and later in other areas.  This allowed publishers with newsracks outside the CBD to spread compliance costs over nearly two years.

Lauder publishes a monthly paper that it distributes without charge under the names *Houston Tribune* and *Heights Tribune*.  The paper, which Lauder began publishing in 1986,  features cheerful, "positive news" about Houston.  According to Ms. Lauder, she distributed the paper to between approximately 20,000 and 22,000 readers each month before the City passed the ordinance. Before the ordinance's passage, Lauder distributed the paper in private locations, such as restaurants or stores, and through 65 newsracks located in public rights-of-way.  A small number of individuals subscribed and received the paper by mail.

The newsracks Lauder used in the public rights-of-way did not comply with the ordinance. They were plastic, not metal; blue, not forest green; and generally weighted with bricks or cement blocks placed inside a hollow base rather than mounted on a cement base.  Lauder did not attempt to obtain compliant newsracks.  Instead, Lauder removed many of its newsracks from public rights-of-way, although some were kept in place in violation of the ordinance.

As soon as Ms. Lauder learned of the ordinance, she began contacting City Council members and City employees.  She spoke at City Council meetings seven times, asking that the City modify or repeal the ordinance.  The City refused.  On July 7, 2007, Lauder applied for a newsrack permit for its noncompliant newsracks, correcting and resubmitting the application on December 28. (Pl.'s Ex. 7; Def.'s Ex. 7).  The City denied the permit application on January 18, 2008 because the

8

newsracks violated the ordinance.  (Pl.'s Ex. 8).  Lauder appealed, (Pl.'s Ex. 9), but its appeal was denied.

Lauder sued the City on October 28, 2008, alleging that the ordinance is unconstitutional on its face and as applied.[2]  In its amended complaint, Lauder alleges that the "provisions were formulated by a small number of publications, and designed to protect those publications from the tremendous costs of compliance; the Ordinance is overbroad in coverage and requirements, and vague with respect to its geographic coverage and enforcement; does not provide adequate procedural protections; provides no guidelines for uniform and equitable enforcement; and imposes outrageous costs on the exercise of protected speech."  (*Id.* ¶ 75).  Lauder alleges that the "costs and over-specific newsrack requirements are discriminatory as written, and go far beyond the interest of safety and aesthetics."  (*Id.*).  Lauder claims that the "ordinance is directed at a traditional speech forum and unreasonably burdens the rights of Plaintiff to participate in the forum."  (*Id.* ¶ 76).  Lauder alleges that the "practical effect of the ordinance is to take small publications off the streets and to threaten their business model" and that "it works as a prior restraint of Plaintiffs' First Amendment rights . . . [because] the licensing and decal fees are beyond any amount necessary to defray reasonable administrative costs."  (*Id.* ¶¶ 77–78).

After an evidentiary hearing held on November 25, 2008, this court denied Lauder's request for a temporary restraining order, stating on the record the findings and conclusions that Lauder had failed to make the necessary showing for such relief.  In February 2009, Lauder moved for leave to amend to add the publisher Spanish News, Inc. as a plaintiff.  (Docket Entry No. 22).  A proposed

---

[2]    The amended complaint also asserted an antitrust claim.  (*Id.* ¶¶ 79–80).  The claim was dismissed at Lauder's request the first day of the bench trial.

amended complaint including this plaintiff was filed with the motion.  (Docket Entry No. 24).  The City opposed the motion.  (Docket Entry Nos. 32, 33).  This court granted the motion to add Spanish News as a plaintiff.  (Docket Entry No. 37).  Lauder also moved for leave to add the *African-American News* as a plaintiff, but had no amended complaint to support the addition.  This court granted the motion but ordered Lauder to file an amended complaint with this party and its claims included by April 10, 2009.  No amended complaint was filed.  Before trial, Lauder asked and was allowed to dismiss Spanish News as a plaintiff.  (Docket Entry No. 46).

The City moved to dismiss on the basis that based on the ordinance language, Lauder's complaint failed to state a claim.  (Docket Entry No. 44). Before the bench trial began on January 25, 2010, this court ruled on the pending motions.  This court dismissed the allegations that: 1) the ordinance was unconstitutionally vague because it did not adequately define "central business district"; 2) the ordinance was an unconstitutional content-based restriction; and 3) the ordinance left City employees with too much discretion to grant or deny licenses and to seize noncompliant newsracks.

Lauder also told this court that it would not pursue its disparate-impact claim that the ordinance was unconstitutional because larger publications could more easily comply with its requirements.  Lauder acknowledged that "there is no disparate impact theory under the First Amendment."  *See Norton v. Ashcroft*, 298 F.3d 547, 553 (6th Cir. 2002) 298 F.3d 547); *accord United States v. Weslin*, 156 F.3d 292, 297 (2d Cir. 1998); *United States v. Dinwiddie*, 76 F.3d 913, 923 (8th Cir. 1996); *Terry v. Reno*, 101 F.3d 1412, 1419–20 (D.C. Cir. 1996); *see also Chicago Observer, Inc. v. City of Chicago*, 929 F.2d 325 (7th Cir. 1991) (upholding an ordinance that affected only a single publication).

Lauder clarified that its focus was on the detailed requirements the ordinance imposed for the materials and dimensions for newsracks and on the compliance costs.  Lauder explained that the detailed requirements meant that the problem was not too much official discretion to decide which publishers or distributors would receive a permit but rather overly prescriptive requirements and an absence of any discretion on the part of City officials to deviate from them.  Although Lauder initially faulted other portions of the ordinance, it narrowed its challenge to the requirements that each newsrack: 1) be made of 20-gauge or thicker zinc-coated steel; and 2) sit atop a 95-pound cement base.  Three specific questions remained for trial: 1) whether the newsrack specifications survive intermediate scrutiny under the First Amendment; 2) whether the permit fees are reasonably related to the City's administrative costs; and 3) whether the ordinance affords adequate procedures for review.   Each is analyzed below.

### B.       Whether the Newsrack Specifications Survive Intermediate Scrutiny

The two Supreme Court cases to consider newsrack regulations involved one ordinance that the Court found left officials too much enforcement discretion and another  ordinance that targeted only commercial publications.  *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988).  The Supreme Court has not considered a newsrack ordinance under the test for content-neutral speech regulations.  There are no Fifth Circuit cases addressing newsrack regulations.  There are cases in other circuits, however, that provide useful guidance, with the Supreme Court and Fifth Circuit cases addressing general First Amendment principles.

The First Amendment clearly applies not only to the contents of newspapers but also to their means of distribution.  *Houston Chronicle Publ'g Co. v. City of League City, Tex.*, 488 F.3d 613,

622 (5th Cir. 2007).  That protection, however, does not preclude the government from regulating the means of distribution.  *See id.* at 616, 622–23 (holding that a city's ban on soliciting in a roadway was constitutional even though the ban impaired selling newspapers at intersections).  As noted above, the City of Houston newsrack ordinance at issue in this case is content-neutral.  The parties agree that the public rights-of-way covered by the ordinance are in the category of a traditional public forum.  "[S]treets . . . have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Hague v. CIO*, 307 U.S. 496, 515 (1939); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 579 (1995) (quoting *Hague*, 307 U.S. at 515); *Perry Educ. Ass'n*, 460 U.S. at 45 (noting that streets and parks are "[a]t one end of the spectrum" among "places which by long tradition or by government fiat have been devoted to assembly and debate"); *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010) ("Traditional public forums include sidewalks, streets, and parks that the public since time immemorial has used for assembly and general communication").  The City's  ordinance applies only to newsracks in public rights-of-way. When  a content-neutral regulation applies to a traditional public forum such as sidewalks or other public rights-of-way, the regulation must be "narrowly tailored to serve a significant government interest" and "leave open ample alternative channels for communication of the information."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Int'l Women's Day March Planning Cmte. v. City of San Antonio*, 619 F.3d 346, 369 (5th Cir. 2010); *see also Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 182–83, 186–94 (1st Cir. 1996) (evaluating a content-neutral time, place, and manner newsrack restriction under

intermediate scrutiny); *Gold Coast Publ'ns, Inc. v. Corrigan*, 42 F.3d 1336, 1344 (11th Cir. 1994) (same).

As Lauder acknowledges, the City's ordinance is not a total ban on newsracks in a public right-of-way. Instead, the ordinance sets standards for the appearance, composition, and placement of newsracks. Courts that have invalidated municipal ordinances that completely ban newsracks have often noted that regulations limiting the placement, design, and composition of newsracks are less likely to offend the First Amendment. *See, e.g.*, *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 580 n.6 (4th Cir. 2010) ("Once again, we stress the limited nature of our inquiry. We consider only whether banning all newsracks inside the terminals violated the First Amendment. Such issues as number, placement, and cost are beyond the scope of our analysis."); *Philadelphia Newspapers, Inc. v. Borough Council, Mayor, Manager & Dir. Public Works Borough of Swarthmore*, 381 F. Supp. 228, 244 (E.D. Pa. 1974) ("[A]esthetic considerations could justify the promulgation of reasonable regulations as to the size and appearance of the boxes, and the type and format of permissible identification or advertising."). Many courts have upheld municipal ordinances restricting the placement, composition, and appearance of newsracks. *See, e.g., Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1045 (9th Cir. 2002); *Gold Coast Publ'ns*, 42 F.3d at 1346; *Chicago Observer*, 929 F.2d at 328; *Jacobsen v. Harris*, 869 F.2d 1172, 1174 (8th Cir. 1991); *Jacobsen v. Crivaro*, 851 F.2d 1067, 1070 (8th Cir. 1988); *Gannett Satellite Info. Network, Inc. v. Twp. of Pennsauken*, 709 F. Supp. 530, 538 (D. N.J. 1989); *Kash Enters., Inc. v. City of Los Angeles*, 562 P.2d 1302, 1310 (Cal. 1977) (approving an ordinance that required newsracks to have "clean" and "neat" appearance). Courts of appeals that have upheld such restrictions have relied on

13

municipal interests in reducing visual clutter, alleviating pedestrian congestion, and improving traffic safety. *Honolulu Weekly*, 298 F.3d at 1045 (aesthetics and pedestrian safety); *Gold Coast Publ'ns*, 42 F.3d 1345–46 (visual clutter and traffic safety); *Chicago Observer*, 929 F.2d 325 (visual clutter). The courts have approved regulations requiring publishers to use city-owned newsracks at specific locations, *Honolulu Weekly*, 298 F.3d at 1041–42; specifying colors, labeling, size, and materials used for newsracks, *Gold Coast Publ'ns*, 42 F.3d at 1346; regulating advertisements on newsracks, *Chicago Observer*, 929 F.2d at 327; and requiring that publishers carry insurance and pay licensing fees, *Gold Coast Publ'ns*, 42 F.3d at 1349–50; *Jacobsen*, 869 F.2d at 1174.

The essence of Lauder's attack on the ordinance is that it increases a publisher's costs to a level at which Lauder and others cannot afford to distribute publications in newsracks in public rights-of-way. As a result, Lauder argues, publishers will have more difficulty in reaching readers. In addition, publishers that do not have highly visible newsracks in public right-of-way may have a lower profile with potential advertisers. As noted, although it initially faulted other portions of the ordinance, Lauder has narrowed its challenge to the requirements that each newsrack be made of 20-gauge or thicker steel and sit atop a 95-pound cement base. Lauder argues that the ordinance is not narrowly tailored because the City could have advanced its interests in safety and aesthetics in less expensive ways and that there are insufficient alternative channels of distribution to newsracks located in public rights-of-way.

### 1.    The City's Interests Are Substantial

The record clearly shows that the City has substantial interests to justify regulating the newsracks. The ordinance states, and the City argues, that the regulations are necessary to serve aesthetics and public safety. Both are recognized as legitimate interests for municipal governments.

*Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08 (1981) (describing traffic safety and aesthetics as "substantial governmental goals"). The City has supported its asserted substantial interests with sufficient evidence. *Illusions—Dallas Private Club, Inc. v. Steen*, 482 F.3d 299, 312 (5th Cir. 2007) (holding a regulation invalid because the summary-judgment record contained no evidence supporting the proffered interest); *see also Sonnier v. Crain*, 613 F.3d 436, 450 (5th Cir. 2010) (striking down time, place, and manner regulation because the governmental entity "has not shown by the record in this case that its restrictions are narrowly tailored to serve a significant governmental interest"). The "evidentiary burden . . . is very light"; only "some evidence" is required. *Illusions*, 482 F.3d at 313. For example, in *Lindsay v. City of San Antonio*, 821 F.2d 1103, 1110 (5th Cir. 1987), the Fifth Circuit concluded that forty photographs of portable signs in San Antonio and testimony that they were unattractive were sufficient to show a substantial interest in improving aesthetics by regulating such signs. "The photographs submitted by the City are simply pictures of portable signs, seemingly introduced into evidence to depict what we take to be relatively obvious—that the portable signs are unsightly." *Id.* (citing *Harnish v. Manatee Cnty.*, 783 F.2d 1535 1539 n.4 (11th Cir. 1986)).

The evidence in the present record amply supports a finding that the City's interests in public safety and aesthetics are substantial. The newsrack ordinance is far from the City's first or only regulation to improve the appearance of the City's public spaces and to reduce safety hazards. For example, the City adopted regulations for signs and billboards in 1980, which the Fifth Circuit has upheld against a constitutional challenge. *RTM Media, L.L.C. v. City of Houston*, 584 F.3d 220, 230 (5th Cir. 2009), *cert. denied,* 130 S. Ct. 1719 (2010); *RTM Media, L.L.C. v. City of Houston*, 578 F. Supp. 2d 875, 877 (S.D. Tex. 2008) (affirming the constitutionality of the sign code that was

15

specifically crafted to address traffic safety and aesthetic concerns associated with billboards and attempting to reduce the "visual clutter and distraction along public roadways" by limiting signs). The desire to build on the sign code's perceived success was a recurring theme in the Quality of Life Committee meetings that led to the newsrack ordinance.  (Def.'s Ex. 4).

The record does not support Lauder's argument that the City lacked evidence of, or information about, specific problems that the ordinance was needed to address.  The record contains dozens of photographs of newsracks around the City before the ordinance.  (Def.'s Exs. 19, 21).  The photographs show a jumble of newsracks of various colors and heights, often askew or overturned. Houston residents attended the Quality of Life Committee's meetings to complain about the visual blight and the safety problems caused by the poor quality and deteriorated state of newsracks; their haphazard placement on sidewalks and streets; and the litter they generated.  (Def.'s Ex. 4).  The record also includes letters from businesses and from Metro, the region's mass transit agency, complaining about the litter created by newsracks and urging the City to regulate them.  (Def.'s Ex. 19).  Metro also faulted the newsracks for impeding passengers' access at bus stops.  (*Id.*).  During the process, many of the publishing industry participants acknowledged that the then-existing newsracks created an eyesore in many different parts of the City.  (Def.'s Ex. 4).

The City has also shown a substantial interest in regulating newsracks to improve public safety.  The ordinance requires setbacks at intersections to allow unobstructed sight lines for drivers and requires newsracks to face away from the street so that people do not have to go into the street to retrieve publications.  The cement bases are made uniform across the front and required to be of a consistent and specific size to reduce the risk of pedestrians tripping and to make it easier for those in wheelchairs to pass.  The case law recognizes that a city's interest in the free and unobstructed

16

use of sidewalks can be substantial.  *See Madsen v. Women's Health Ctr.*, 512 U.S. 753, 768 (1994); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981).  This interest was discussed at the Quality of Life Committee meetings that were attended by members of the public.  Council members and City residents also discussed the safety risks to and from children climbing or playing on the brightly colored plastic newsracks and either accidentally or intentionally tipping them over.  Finally, unregulated newsracks created a recognized risk of becoming wind-driven projectiles during hurricanes or other major storms, to which the City is prone.  Other cities in hurricane-prone areas have enacted regulations to limit this risk.  *See, e.g.*, *Gold Coast Publ'ns*, 42 F.3d at 1340 (evaluating the newsrack ordinance of Coral Gables, Florida, which included in its statement of intended purposes to "[p]rovide for public and property safety during hurricane conditions").  One of the witnesses Lauder called, Emilio Martinez, who worked for a publisher, agreed that it was important for outdoor newsracks to be heavy enough to be stationary.

Lauder argues that the absence of specific studies performed by the City on the safety problems of plastic newsracks with hollow bases in which weights can be placed — as opposed to the steel newsracks with cement bases the ordinance requires — makes the ordinance requirements invalid.  Ms. Lauder testified that she did not personally experience problems with her plastic newsracks toppling and had not received complaints that people had tripped over them.  As noted, however, the City did receive information about the safety and aesthetic problems the unregulated newsracks presented during the hearings on the proposed ordinance.  And the case law does not support the argument that specific empirical studies are required to document the extent of such problems before content-neutral regulations are permissible.  "Studies, anecdotes pertaining to different locales, history, consensus, and simple common sense may serve as evidence that the

17

proposed activity will endanger significant interests.  In the case of safety restrictions, for example, the regulating body need not wait until someone is injured before promulgating regulations." *United Brotherhood of Carpenters & Joiners of Am. Local 586 v. NLRB*, 540 F.3d 957, 967–68 (9th Cir. 2008) (citations and quotations omitted).  Concerns about aesthetics and safety are often borne out by observation and common sense.  Many other newsrack ordinances cited by both parties demonstrate that cities across the country have identified unregulated newsracks as threats to these interests.  (Pl.'s Ex. 25; Def.'s Ex. 17).  Common sense and experience bear out Houston's substantial interests in regulating newsracks to improve public safety and the City's physical appearance.

In its closing argument, Lauder suggested that although the City's interests might be strong enough to justify the ordinance's newsrack restrictions and requirements within the central business district, the interests are not strong enough to justify applying the regulations outside the CBD. Insofar as this is an argument that outlying areas are less deserving of aesthetic protection than those within the CBD, the argument is unpersuasive.  Several courts have disapproved of attacking the government's interest in improving the appearance of public areas based on a notion that certain areas are less aesthetically valuable than others.  As former Chief Justice Rehnquist stated in a case involving billboard regulation, "the aesthetic justification alone is sufficient to sustain a total prohibition of billboards within a community, regardless of whether the particular community is a historical community such as Williamsburg or one as unsightly as the older parts of our major metropolitan areas.  Such areas should not be prevented from taking steps to correct, as best they may, mistakes of their predecessors."  *Metromedia*, 453 U.S. 490, 570 (1981) (Rehnquist, J., dissenting) (quotation marks omitted); *see also Members of the City Council of Los Angeles v.*

*Taxpayers for Vincent*, 466 U.S. 789, 817 (1984) ("[T]he esthetic interests that are implicated by temporary signs are presumptively at work in all parts of the city, including those where appellees posted their signs, and there is no basis in the record in this case upon which to rebut that presumption. These interests are both psychological and economic. The character of the environment affects the quality of life and the value of property in both residential and commercial areas."); *Gannett Satellite Info. Servs.*, 709 F. Supp. at 538–39 (upholding newsrack ordinance that applied in an urban area "consist[ing] of stores, utility poles, commercial billboards, traffic signs, benches, fire hydrants, mail boxes, street signs and houses" and declining to second-guess the government's conclusion that the area deserved aesthetic protection (quotations and alternations in original omitted); *cf. Gold Coast Publ'ns*, 42 F.3d at 1346 ("The Supreme Court has repeatedly deferred to the aesthetic judgments of municipalities and other government bodies when evaluating restrictions on protected expression." (citing cases)); *but see Providence Journal*, 665 F. Supp. at 115 n.17 ("[A]n aesthetic interest in preserving an entire community's appearance would be hard to find in a city that has placed modern streets and conveniences alongside its historic buildings.").

Lauder's counsel also suggested that pedestrian congestion is less significant outside the CBD, presumably making the regulations overbroad. But Lauder has not challenged the portions of the ordinance that restrict newsrack placement. And there are clearly many areas outside the CBD where newsracks are crowded together and both pedestrian and vehicle traffic are heavy. The record shows that areas outside the CBD were of primary concern to the City Council in enacting the newsrack ordinance. The record contains numerous photographs of newsracks outside the CBD. (Def.'s Ex. 21). Several who spoke before City Council lamented the proliferation of poorly maintained, deteriorating, unsightly newsracks outside the CBD and encouraged the City not to limit

the ordinance to the CBD.  Councilwoman Toni Lawrence repeatedly emphasized that her constituents, who did not live in the CBD, were tired of the City focusing on the CBD's aesthetic and other issues but ignoring similar concerns about other neighborhoods in the City.  (Def.'s Ex. 4).  The City's interest in regulating newsracks is substantial both within and outside the CBD.

### 2.    The Restrictions Are Narrowly Tailored

The ordinance must not only serve substantial interests; it must also be narrowly tailored to achieve that end.  *Knowles v. City of Waco, Tex.*, 462 F.3d 430, 435–36 (5th Cir. 2006).  Narrow tailoring under intermediate scrutiny is different from strict scrutiny's narrow-tailoring requirement. Strict scrutiny requires the government to show that it has used the least restrictive means of advancing a compelling interest.  *See World Wide Street Preachers Fellowship v. Town of Columbia*, 245 F. App'x 336, 343 (5th Cir. 2007) (unpublished) (per curiam) ("If a less restrictive alternative is available, the governmental restriction cannot survive strict scrutiny.") (citing *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)).  By contrast, the Supreme Court has repeatedly rejected the proposition that narrow tailoring for content-neutral, time, place, and manner restrictions requires the government to adopt the least restrictive means of furthering its interests. *Ward*, 491 U.S. at 799 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984)); *Sonnier*, 613 F.3d at 441 (citing *SEIU v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010)).  "The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Ward*, 491 U.S. at 799 (citations, quotations, and alterations omitted).  "[T]hat 'numerous and obvious less-burdensome alternatives' exist does not automatically compel the conclusion that a regulation burdens 'substantially more' speech than is necessary," though the presence of such alternatives is

20

a relevant consideration. *Globe Newspaper Co.*, 100 F.3d at 190 (quoting *Discovery Network*, 507 U.S. at 418 n.13). "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)) (alterations in *Ward*); *Sonnier*, 613 F.3d at 441 (citing *SEIU*, 595 F.3d at 596). Only "[i]f 'a substantial portion of the burden on speech does not serve to advance' the ordinance's stated goals, [will a court conclude that] the ordinance is not narrowly tailored." *See Knowles*, 462 F.3d at 434 (quoting *Ward*, 491 U.S. at 799).

Lauder argues that the ordinance is invalid because it could have been less restrictive. Specifically, Lauder argues that the ordinance should permit publishers to use newsracks made of a greater variety of materials than the specified steel of a minimum gauge and should permit the use of other means to stabilize and weigh the newsracks besides a concrete base. Lauder argues that the ordinance should permit its newsracks like its newsracks, which are plastic and use removable bags of sand or gravel or bricks as weights.

The City has presented evidence that the ordinance requirements of steel of at least a certain gauge and a cement base further the significant interests in both public safety and aesthetics. The City wanted materials that would withstand corrosion and wear; that would present a uniform look and not deteriorate over time; that would be stable and would not fly in a high wind or tip; and that could be removed for repair or other needs. The record showed that the material specifications and the range of permitted weights and dimensions serves these interests but do not eliminate substantially more speech than necessary.

The ordinance's requirements of steel racks and cement bases are narrowly tailored. The City enacted the ordinance to make newsracks more attractive and safer. To further its aesthetic

interests, the City enacted a consistent set of standards to govern newsracks' materials and color and imposed a range of permitted dimensions.  Courts have held that imposing uniform requirements on newsracks' appearance is a narrowly tailored way to advance a municipality's significant interest in aesthetics.  *Honolulu Weekly*, 298 F.3d 1037 at 1045; *Gold Coast Publ'ns*, 42 F.3d at 1346.  The photographs of compliant newsracks in the record show a great reduction in visual clutter.  (Pl's Exs. 13–18).  Instead of a chaotic rainbow of newsracks made of disparate materials, ranging from cracked and deteriorated neon plastics to rusted metal, of different sizes and shapes and facing various directions, the ordinance requires neatly arranged rows of forest-green boxes on cement bases.  The photographs in the record demonstrate the results.  Requiring zinc-coated steel of a certain gauge means that the newsracks also resist rust, corrosion, and deterioration, important in a city with a climate as humid, hot, and otherwise challenging as Houston's.  *Cf.* MIAMI–DADE CNTY., FLA., CODE OF ORDINANCES § 54-268(a) (requiring construction of "galvanized steel with corrosive resistant hardware and door assembly").

    The steel material and cement-base requirements also further the City's interest in public safety.  Steel of the required gauge and finish is durable.  A 95-pound cement base prevents newsracks from tipping over, being displaced or moved, or being blown in a high wind.  At one point, the City considered bolting the newsracks down as an alternative, but as explained during the hearings, (Def.'s Ex. 4), that would make the racks harder to service and difficult for emergency personnel to move if they were in the way.  A City engineer also testified that the low center of gravity of the cement base helps prevent the newsracks from tipping—or being tipped—over or from blowing.  Comments at the hearings and photographs in the record suggest these were significant problems before the ordinance.

The City also presented evidence to support its decision to require a cement base as opposed to allowing a hollow plastic or steel base that could be filled with bags of sand or gravel or bricks. Such bags readily deteriorate in Houston's climate, allowing the sand and gravel to escape, resulting in both a source of litter and an ineffective base weight. And the bags or bricks can be readily removed, for purposes ranging from commercial uses to vandalism.

Lauder has not contended that the ordinance restricts any expressive quality in the materials used for the newsracks. Lauder does not challenge the requirement of a single color. *Gold Coast Publ'ns*, 42 F.3d at 1350.[3] Lauder has not argued that the locations available under the newsrack ordinance are insufficient. Nor has Lauder argued that the newsrack ordinance prevents speech by requiring features that do not correspond to newsracks that are readily available in the marketplace. The record includes promotional materials for a compliant newsrack, (Def.'s Ex. 18), and successful applications for newsrack permits, (Def.'s Ex. 6). Lauder's major argument is that by imposing such stringent requirements on the materials permitted for newsracks, the ordinance increased the price to acquire a newsrack. Cheaper newsracks mean that more publishers can get distribute their publications on the City's rights-of-way. Lauder's preference for newsracks made of plastic over metal is based on the cheaper cost of plastic. Lauder's preference for newsracks mounted on a base that is made of hollow plastic with a bag of sand or gravel or a brick placed inside, rather than a cement base, is based on the cheaper cost of the materials and labor required for placement. Witnesses put the cost of compliant newsracks at between $200 and $300 for each rack.

---

[3]   Mark Rome testified that *Rumbo* opposed the color restrictions, and Doris Ellis of the *Houston Sun* also objected to the monochrome requirement. Choosing one color for newsracks furthers the City's interest in aesthetics and does not sweep too broadly. Publishers may still identify their publications through labeling.

"Although the [Supreme] Court has shown special solicitude for forms of expression that are much less expensive than feasible alternatives and hence may be important to a large segment of the citizenry, this solicitude has practical boundaries."  *Taxpayers for Vincent*, 466 U.S. at 812 n.30 (citations omitted).  The role of costs in the First Amendment analysis is functional, not absolute.  "[T]he First Amendment does not guarantee a right to the least expensive means of expression." *Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*, 745 F.2d 767, 774 (2d Cir. 1984) (citing *Heffron*, 452 U.S. at 654–55; *Kovacs v. Cooper*, 336 U.S. 77, 88–89 (1949); *accord Globe Newspaper Co.*, 100 F.3d at 193 ("The First Amendment does not guarantee a right to the most cost-effective means of distribution or the rent-free use of public property.") (citing *Capitol Sq. Review Bd. v. Pinette*, 515 U.S. 753, 761 (1995)); *Jacobsen*, 869 F.2d at 1174 ("[T]he City need not provide . . . the least expensive method of exercising . . . first amendment freedoms.") (affirming liability-insurance requirement for newsracks).

The parties have not cited, and this court has not found, a decision invalidating on First Amendment grounds an otherwise valid newsrack restriction because of compliance costs.  *See, e.g.*, *Globe Newspaper Co.*, 100 F.3d at 193–94 (holding that when the challenged regulation had the practical effect of eliminating all newsracks, street vendors were an adequate alternative channel for distribution because the "First Amendment does not guarantee a right to the most cost-effective means of distribution or the rent-free use of public property"); *Gannett Satellite Info. Network, Inc.*, 745 F.2d at 774 ("Gannett cannot successfully argue that the more expensive alternative distribution methods deprive it of its First Amendment right to distribute its papers.  As a large commercial distributor, it should be ready to absorb increases in the cost of doing business." (citations omitted)).

At the same time, the City does not cite newsrack cases concluding that compliance costs are irrelevant.  Evidence that compliance costs are "prohibitive" are part of the functional analysis

24

of the impact of the ordinance and the availability of alternative means of distribution.  *See Globe Newspaper Co.*, 100 F.3d at 194 ("While we do not dispute the Newspapers' claims that newsracks provide a relatively inexpensive means of distribution, which in some cases meet distribution needs where others are either prohibitively expensive or altogether unavailable, nothing in the record indicates how these concerns are implicated in the instant case. "); *Hop Publ'ns v. City of Boston*, 334 F. Supp. 2d 35, 46–47 (D. Mass. 2004) (refusing to find insufficient alternatives for distribution of a small publication because there "is not a sufficient factual basis for the conclusion that [available means of distribution] are prohibitively expensive for plaintiffs' businesses as a whole"); *see also Kovacs*, 336 U.S. at 88–89 ("That more people may be more easily and cheaply reached by sound trucks . . . , is not enough to call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance when easy means of publicity are open.").

Lauder's arguments against narrow tailoring are not persuasive under the narrow tailoring—as opposed to the least-restrictive-means analysis—that this court must apply.  *Ward*, 491 U.S. at 799.  First, Lauder argues that the ordinance should allow publishers to purchase newsracks made of plastic as well as metal.  Ms. Lauder testified that she believed she could have plastic newsracks painted the forest-green color required by the ordinance.  It is true that plastic newsracks come in a variety of colors.  Included in the evidence are several photographs of Lauder's newsracks, including one in color.  But the plastic newsracks in the photographs, and those that were common before the ordinance, simply do not look like the metal newsracks required by the ordinance.  An employee of the *Houston Press* testified that the publication decided to abandon its plastic newsracks "because of the quality."  "They don't look as good," he explained.  "They don't weather as well . . . ."  (Def.'s Ex. 26).  Lauder has presented no evidence other than Ms. Lauder's unsupported opinion that it is possible to paint plastic racks to make them look like metal.

25

Lauder also objects that the choice of steel for newsracks is not tailored to the purpose of avoiding deterioration because steel rusts. Lauder offered photographs of a rusty metal newsrack, (Pl.'s Exs. 67–69). But Ms. Lauder conceded that she did not know how old that newsrack was or when it was painted. Ms. Lauder testified that her personal experience with steel newsracks was limited to a period early in her career as a publisher. Her career began in 1986. She presented a witness, Emilio Martinez, who testified that steel newsrack durability had improved substantially in recent years. The City presented evidence that steel would meet the objectives of durability and strength. Many other recently enacted municipal newsrack ordinances also specify steel of similar minimum gauge and treatment. *See, e.g.*, MIAMI BEACH, FLA., CODE OF ORDINANCES, § 82-256(4)(a) (requiring construction of "galvanized steel with corrosive resistant hardware and door assembly"); MIAMI–DADE CNTY., FLA., CODE OF ORDINANCES § 54-268(a) (same); EL PASO DE ROBLES, CAL., MUNICIPAL CODE, § 11.35.040(A)(1) (requiring newsracks to be "metal" and "equivalent" to certain makes and models); LOS ANGELES, CAL., MUNICIPAL CODE § 42.00(f)(7)(B)(3) (requiring that newsracks be "primarily constructed of metal"); PHILADELPHIA, PA., CODE OF ORDINANCES § 9-211(3)(a)(.2) (requiring boxes of "20-gauge zinc-grip steel or thicker").[4]

Lauder argues that requiring a heavy material for the base is unnecessary because the necessary stability and weight can be obtained by placing bricks, concrete blocks, or bags of sand or gravel inside a hollow base. The advantage of this approach for a small publisher is that it facilitates removing newsracks from the public rights-of-way for maintenance. Ms. Lauder testified

---

[4]   Lauder's counsel at one point highlighted that the materials requirement is not just for steel of a minimum gauge, but for zinc-coated steel. This specification neither shows a failure of narrow tailoring nor inadequate alternatives. Lauder has not indicated, for example, that zinc coating significantly increases the cost of a newsrack or that newsracks made of steel but not coated in zinc are available.

that although she could not lift a steel newsrack with a cement base, she could remove a brick, block, or bag from the hollow bottom of a newsrack and remove it on her own, avoiding the need to hire labor to retrieve newsracks.  But placing readily removable bricks or blocks in the base presents the problem that they are readily removable, by vandals and children as well as others.  Using bags of sand or gravel presents additional problems of corrosion and leakage of the contents.

Lauder also argues that requiring cement bases does not further the City's interest in public safety because the bases present a tripping hazard.  Under the ordinance, the cement bases must measure 23 inches, front to back, and must extend no further than 1.5 inches beyond the sides of the newsracks.[5]  (Def.'s Ex. 1, § 40-455(b)(5)).  As already explained, using uniform cement bases to stabilize newsracks is a narrowly tailored means to improving aesthetics and safety.  During one hearing, the Committee's chair, Holm, defended the uniform front-to-back dimension requirements as essential to making tripping less likely.  The approach Lauder advocates of using hollow bases of different dimensions in which different kinds of weights could be placed could add to, rather than reduce, the tripping hazard.

Lauder fails to show that the City imposed newsrack requirements that were either ineffective to meet the ordinance objectives or that unnecessarily increased the costs of compliance. There is no evidence of the kind of substantial burden on speech required to defeat narrow tailoring under intermediate scrutiny.  *Ward* illustrates the limited but important discretion cities enjoy in setting time, place, and manner restrictions.  The issue in *Ward* was New York City's requirement that bands giving concerts in Central Park use a city sound technician.  *Ward*, 491 U.S. at 787.  The

---

[5]   An earlier version of the ordinance did have a uniform requirement for the newsrack bases' width.  A representative from the *Houston Chronicle* complained that having a uniform base width would limit the number of newsracks that could fit in the ten-foot banks permitted under the ordinance.  The draft ordinance was amended to allow flexibility on width.

city enacted the regulation in response to complaints about noise from other park users. *Id.* The court of appeals concluded that there was no narrow tailoring because several less restrictive alternatives existed, including directing band technicians to keep the volume below a certain level, using a volume-limiting device, or simply pulling the plug on anyone whose concert was too loud. *Id.* at 789. In reversing, the Supreme Court concluded that "[t]he alternative regulatory methods hypothesized by the Court of Appeals reflect nothing more than a disagreement with the city over how much control of volume is appropriate or how that level of control is to be achieved." *Id.* at 801. Lauder's arguments against the City's ordinance requirements, and the absence of greater flexibility in the choice of materials and method of stabilizing and weighting the newsracks suffer from the same flaw. None of the arguments shows that the ordinance hinders the means of distributing publications so much as to defeat narrow tailoring. "Whenever government draws a line, there will be cases close to the mark. One can always claim that a small change could have accommodated more conduct, at a little sacrifice in the government's objective. Choosing how much to accommodate at what sacrifice in other objectives is precisely the business of government . . . ." *Gold Coast Publ'ns*, 42 F.3d at 1348 (quoting *Chicago Observer*, 929 F.2d at 329).

Lauder argues that the ordinance should have been less prescriptive and instead provided for flexible alternatives with more discretion in the parking management division officials. Lauder points to the newsrack ordinance in *Gold Coast Publications* as support. That ordinance required using one of several specific makes and models of newsracks or an "equivalent," defined as the "same size, dimensions, and style of the specified newsrack." *Id.* at 1341 (quoting the ordinance). To the extent Lauder argues that the City of Houston should have allowed racks made of plastic and weighted by bricks as an "equivalent" to what the ordinance required, the record defeats her argument. Although the ordinance left open various ways in which publishers could comply—a

range of heights and shapes, and the ability to use different kinds of identifying labels—the record shows that the City decided that newsracks lacking cement bases and steel construction were not sufficient to meet the ordinance goals and were not equivalent to the newsracks the ordinance requires.  To the extent Lauder argues that the ordinance is constitutionally invalid because it gives officials too little discretion to deviate from the requirements, the law does not support her argument. There are constitutional concerns that arise when content-neutral time, place, and manner restrictions leave such discretion to government decisionmakers, raising the specter of covert content discrimination.  *See, e.g.*, *Lakewood*, 486 U.S. at 757.  Not all discretion is constitutionally impermissible, *see Int'l Women's Day March*, 619 F.3d at 364, but Lauder would have this court significantly curtail the discretion the government enjoys in crafting such restrictions by forcing it to have more discretion in enforcing "flexible" restrictions.  When fears of content discrimination are least, narrow tailoring provides "state and local governments . . . some degree of flexibility to regulate . . .  speech."  *Lutz v. City of York, Pa.*, 899 F.2d  255, 269 (3d Cir. 1990).  The City has acted within the range of constitutionally permissible regulation in this case.

### 3.    Lauder Has Ample Alternatives for Distribution

Having determined that the ordinance is narrowly tailored, the next question is whether it leaves open ample alternatives for communication.  "While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate."  *Int'l Women's Day March*, 613 F.3d at 371 (quoting *Taxpayers for Vincent*, 466 U.S. at 812).  Alternative means of reaching an audience may be adequate even when there is a "'reduction in the potential audience' for speech in the alternative venue."  *Id.* at 372 (quoting *Sullivan v. City of Augusta*, 511 F.3d 16, 44 (1st Cir. 2007)).

29

There is no dispute that publishers who comply with the ordinance may place their newsracks on the City's rights-of-way.  Lauder does not argue that there is insufficient space left open on the City's rights-of-way for its newsracks.  Nor does it appear that there is difficulty in obtaining a compliant newsrack.  The record includes advertisements for compliant newsracks, (Def.'s Ex. 18), and successful applications for newsrack permits.  (Def.'s Exs. 18).  An employee of the *Houston Press* testified that the steel specifications were industry standard.  (Def.'s Ex. 26). *Buena Suerte*'s employee Martinez testified that he had been able to buy compliant newsracks and put them on the streets.  Without considering compliance costs, there are clearly ample distribution alternatives to Lauder's noncompliant plastic newsracks.  *See, e.g.*, *Globe Newspaper Co.*, 100 F.3d at 193 (holding that street vendors were adequate alternative when newsracks were banned) (citing *Taxpayers for Vincent*, 466 U.S. at 812 (finding ample alternative channels available where ordinance "did not affect any individual's right to exercise the right to speak and distribute literature in the same place where the posting of signs . . . is prohibited")).  Lauder's only argument that it is that it cannot afford compliant newsracks.

As noted above, although no court has struck down a newsrack ordinance because of compliance costs, the cases leave open the possibility that compliance costs can be problematic if they are "prohibitively expensive."  *Hop Publ'ns*, 334 F. Supp. 2d 35, 46–47.  Here, as in *Hop Publications*, the evidence does not show that the costs of compliance leave Lauder with inadequate alternative means of reaching its readers.

Before looking to the record evidence on the effect of the costs on Lauder's ability to comply with the ordinance requirements, it is helpful to note that the City modified the ordinance to give publishers time to comply and to spread the costs of doing so.  The City Council passed the ordinance on February 14, 2007.  The newsrack specifications first took effect in the Central

Business District at the end of the year, on December 31, 2007.  Lauder had an additional year, until December 31, 2008, to comply outside the CBD, nearly two years after the ordinance's enactment. The City decided to stagger the effective date partially in response to publishers' concerns.  Those concerns included that the financial impact on smaller publishers, such as Lauder.  The question is not whether Lauder had cash on hand for immediate compliance, but whether it could afford to purchase compliant newsracks over the nearly-two year period before the ordinance would affect the last of its newsracks in the City's right-of-way.

Ms. Lauder's testimony and the argument of her counsel left it unclear whether she believed the cost to Lauder was beyond its financial capability, as opposed to a cost it would rather not assume.  For example, Ms. Lauder testified at the preliminary injunction hearing that she considered it unreasonable that Lauder would have to remove the plastic newsracks it already owned from the public rights-of-way — although it could continue to use them elsewhere — and replace them with compliant newsracks.  Ms. Lauder testified that she did not think Lauder should have to take out a loan to comply with the ordinance.  But, as noted above, the First Amendment does not protect a right to the most financially advantageous method of distribution.

To the extent Lauder argues that the compliance costs are prohibitive, the record does not support that assertion.  Ms. Lauder testified that Lauder owns 65 newsracks, of which 24 to 28 were in the CBD.  She estimated the cost of a compliant newsrack to be approximately $300.[6]  Assuming that Lauder had 28 newsracks in the CBD and that the cost estimates are accurate, Lauder had ten months to raise $8,400 if it wanted to replace all the CBD newsracks.  Lauder then had another year

---

[6]   The City's witness, Maria Irshad, testified that the City had obtained estimates of approximately $200 for a compliant newsrack and base.

to spend another $11,100 to replace the 37 remaining newsracks outside the CBD.  Ms. Lauder's testimony shows that Lauder's cost of compliance is approximately $19,500 over a two-year period.

The question, assuming that the compliance costs can make alternatives inadequate, is whether this level of expense is "prohibitively expensive."  Lauder has not suggested the appropriate metric for determining whether the compliance costs are prohibitive.  But the evidence shows that Lauder could pay the compliance costs.  Lauder's tax returns show that its revenues from 2004 to 2008 ranged from between $96,778 in 2006 to $113,507 in 2004, averaging just over $106,700.  The cost of replacing Lauder's entire stock of affected newsracks with compliant newsracks would have been approximately 10 percent of the revenues for two years.[7]  Lauder has presented no other evidence of its ability to pay.  The record shows that Lauder had the financial resources to purchase compliant racks to continue distributing newspapers on the public rights-of-way.

The First Amendment allows some reduction in potential audience by a valid regulation.  *See Int'l Women's Day March*, 619 F.3d at 372.  Even if Lauder could not replace all the newsracks covered by the ordinance, the evidence suggests that it could strategically place compliant newsracks to maximize circulation.  Ms. Lauder testified that she stocked the newsracks with approximately 300 copies of the *Tribune* each month.  She would restock some newsracks that ran out of newspapers midmonth.  She did not testify that she restocked all newsracks, suggesting that there may be considerable variation from newsrack to newsrack.  There is no evidence of the extent of

---

[7]    By comparison, Lauder estimated that she had spent between $15,000 and $20,000 on this case by the preliminary injunction hearing.

such variation.  But whatever the extent, if Lauder could not replace every one of her newsracks, she could prioritize and replace those that reach the most readers, further reducing the compliance costs.[8]

It is also unclear to what extent the *Tribune*'s circulation decline resulted from the ordinance. Ms. Lauder testified that she distributed the *Tribune* through newsracks located on public rights-of-way and on private property, such as in restaurants, as well as some subscriptions.  Total circulation hovered between 20,000 and 22,000 per month.  Although Ms. Lauder testified that she believed her circulation decreased "considerably" after the ordinance, she could not testify how much.  The evidence does not distinguish between the number of newspapers Lauder distributed through the newsracks on the public rights-of-way as opposed to newsracks located elsewhere.[9]

The record shows that Lauder has alternative means of distribution besides placing newsracks on the public rights-of-way.[10]  These alternative means include newsracks on private places frequented by the public.  One of  Lauder's witnesses was Roy Malonson of the *African-*

---

[8]    The Fifth Circuit has referred to access to a "potential audience" when considering adequate alternatives.  *Int'l Women's Day March*, 2010 WL 3491532, at *20.  This may not correlate perfectly with the *Tribune*'s actual distribution figures, but the actual audience seems the most likely indicator of the potential audience.  In any event, the record contains no other evidence that bears on potential audience.

[9]    To the extent that Lauder relies on the cost of plastic newsracks that it can no longer use in the City's rights-of-way, it is not clear that these sunk costs, as opposed to compliance costs, are relevant to determining whether the ordinance compliance costs are prohibitive.  Even if relevant, the record provides no basis to determine their extent.  And Lauder could use its noncompliant newsracks outside the public rights-of-way.

[10]    Courts have disagreed whether considering means of communication outside a public forum is appropriate. *Compare, e.g.*, *Providence Journal*, 665 F. Supp. at 118 (rejecting private means outside the public forum) *with Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*, 745 F.2d 767, 774 (2d Cir. 1984) (considering a newsstand as distribution alternative); *Plain Dealer Publ'g Co. v. City of Lakewood*, 794 F.2d 1139, 1147 (6th Cir. 1986), *aff'd on other grounds*, 846 U.S. 750 (1988); *see also Globe Newspaper Co.*, 100 F.3d at 192–93 (noting but declining to resolve the disagreement); *Gannett Satellite Info. Network*, 709 F. Supp. at 536 n.3 (same).  The Supreme Court and the Fifth Circuit have, however, considered private means of communication outside the desired forum to be adequate alternatives. *Christian Legal Soc'y Chapter of the Univ. of Calif., Hastings Coll. of the Law v. Martinez*, 130 S. Ct. 2971, 2991 (2010) (considering an online Yahoo! message group as an alternative to a public law school's bulletin board); *Int'l Soc'y for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge*, 876 F.2d 494,  498–99 (5th Cir. 1989) (upholding a ban on soliciting automobile drivers that left open alternatives of "door-to-door canvassing [and] telephone solicitations").  Moreover, Lauder has not argued that it is inappropriate to consider such alternatives.

33

*American News*, who testified that his company reaches readers by using newsracks located in the underground tunnel system that honeycombs downtown Houston,[11] in other public places that are not City rights-of-way, and in private businesses.  Another witness, Ted Weisgal, the president of Leisure Learning Unlimited, Inc., testified that his company was able to distribute schedules for its classes inside private buildings and in the City Hall annex, the downtown tunnels, libraries, and in some street-level businesses in the CBD.  Weisgal testified that those locations allowed him to get his message out "to a large extent, but not completely."  Although he testified that enrollment in his company's courses had dropped since the ordinance's enactment—from 22,000 in 2008 to 19,000 in 2009—he acknowledged that economic conditions were also a factor in the decline.  Dorris Ellis, publisher of the *Houston Sun*, testified that she distributes 10,000 copies of her paper each week through approximately 250 locations, none of which are in public rights-of-way.  She reached this level of circulation without using any newsracks in public rights-of-way.

Ms. Lauder's testimony, although equivocal, does not suggest that these opportunities are unavailable to the *Tribune*.  During her testimony, she stated, "I keep trying to put them up in the buildings, you know, in the little shopping centers. . . .  So I put two [newsracks] . . . in shopping centers.  Then I got called by the shopping centers to pick them up, they don't want them there.  So anyway, it's difficult to get into somebody's shopping center."  Ms. Lauder's testimony does not, however, indicate that she sought permission to place her newsracks at a shopping center before doing so.  More importantly, she testified that the *Tribune* is already available in private locations.

---

[11]    Unlike many other cities, where foot traffic is almost exclusively at street level, much of Houston's foot traffic in the CBD is in a private system of tunnels that connect many of the City's major office buildings.  Pedestrians use the tunnels to avoid the heat of the summer, traffic, and inclement weather.  The tunnels contain many shops and restaurants, drawing pedestrians—that is, potential readers—underground.

This court finds that distribution through newsracks and other means with private-property owners' permission is a significant alternative means of distribution.

Another alternative is door-to-door distribution. Ms. Lauder testified that she distributed the *Tribune* door to door for the first three to five years of its publication. She faulted door-to-door distribution as a less efficient means of distribution because many free publications distributed to homes go into the trash unread, while a reader who takes a copy from a newsrack is more likely to read it. This does not, however, show that door-to-door distribution is unavailable as an additional way to distribute newspapers. *Cf. Globe Newspaper Co.*, 100 F.3d at 193 (considering street vendors as an adequate alternative to newsracks, even though more expensive).

The *Tribune* is also available online, which is another alternative means of distribution unaffected by the ordinance. Ms. Lauder testified that she did not know how much online readership the *Tribune* receives and pointed to the financial problems of being an online-only publication. Ms. Lauder testified that in her experience, advertisers and readers demand a print edition. The Supreme Court has recognized that internet publication may be an adequate alternative to more traditional forms of communication, but that case, decided earlier this year, concerned a university, where students have more consistent computer and internet access than other members of the population. *See Christian Legal Soc'y*, 130 S. Ct. at 2991. There is insufficient evidence in this record to allow a finding as to the extent of Lauder's online circulation. But the record is sufficient to find that it is one of several means of distribution available to Lauder unaffected by the newsrack ordinance.

In some cases, it may be important for a publication to have newsracks on a public right-of-way. *Cf. Int'l Women's Day March*, 619 F.3d at 372 (noting that "courts have at times struck down ordinances 'that push protestors far away from their intended audience'" (quoting *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1225 (10th Cir. 2007))). Ernesto Martinez, who

35

works for the Spanish-language publication *Buena Suerte,* testified that it was important to have this publication distributed near bus stops on public rights-of-way because many Spanish speakers rely on buses.   Lauder did not, however, introduce any similar evidence suggesting that having newsracks on the City's rights-of-way is particularly important to reaching its readers.   *See, e.g.*, *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041–42 (7th Cir. 2002) (concluding that bookstores and the Internet were not adequate substitutes for the parking lot outside the Chicago Blackhawks' arena for an author of a book critical of Blackhawks' management because "Blackhawk fans are a fundamentally different market than the market for bookstore readers or Internet users"); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (75-yard security zone prevented anti-war protestors' demonstration from reaching the intended audience, military leaders); *Students Against Apartheid Coalition v. O'Neil*, 660 F. Supp. 333, 339–40 (W.D. Va. 1987) (school regulation prohibiting protest shanties on lawn of building where board of visitors meets is not rendered valid by permission to erect shanties in other places not visible to members of Board, who were the intended audience); *Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago*, 419 F. Supp. 667, 674 (N.D. Ill.1976) (permitting a parade route through black neighborhood not a sufficient alternative to a route through white neighborhood when white people were the intended audience).   Lauder argued that having some newsracks visibly present on City rights-of way may be important to potential *Tribune* advertisers.   Lauder pointed to declining advertising revenues after the ordinance became effective as support for her argument, but in her testimony, Ms. Lauder conceded that the economic downturn also played a role.

Under the case law, the ordinance requirements for making newsracks consistent in size and color and using decals to identify the publication are properly treated as restrictions on commercial speech, which receive less First Amendment scrutiny.   *Hoover v. Morales*, 164 F.3d 221, 225 (5th

Cir. 1998); *see also Gold Coast Publ'ns*, 42 F.3d at 1347 (treating restrictions on newsrack labeling that made the newsracks less distinctive as restrictions on commercial speech). Even if there were evidence showing that ordinance made placing such decal-adorned newsracks on the streets prohibitively expensive—and there is not—this aspect of the ordinance would nonetheless be constitutional. Although using newsracks as advertisements is more efficient and less burdensome than such alternatives as door-to-door or telephone solicitation, Lauder has not presented any evidence that these alternatives are inadequate. *See Int'l Soc'y of Krishna Consciousness of New Orleans*, 876 F.2d at 498–99.

The ordinance is constitutional facially and as applied to Lauder. The requirements of using steel of a minimum thickness and a protective coating, and a cement base, are narrowly tailored to the City's substantial interests in aesthetics and public safety and leave ample alternative channels of communication. Considering distribution alternatives other than the rights-of-way makes it even clearer that Lauder has ample alternatives to reach its potential readers and advertisers. Even assuming that an otherwise constitutional ordinance may be unconstitutional because it the costs of compliance are prohibitive, the record does not show that the costs to Lauder of replacing enough of its newsracks in the affected areas to reach a roughly similar audience would have been so prohibitive over the nearly two-year phased implementation period as to raise a constitutional problem.

### C.     The Permit and Application Fees

Lauder also argues that the fees under the ordinance are excessive. The ordinance requires a one-time application fee of $300 from any publisher wishing to place newsracks in public rights-of-way. Publishers must also seek a permit for each newsrack, at a cost of $5 per newsrack, renewable each year. The City issues a label when the permit is issued, which the publisher must

affix to the newsrack. Under certain circumstances, such as if the decal becomes worn, the City may require that the publisher pay $1 to replace it.

"Government cannot tax First Amendment rights, but it can exact narrowly tailored fees to defray administrative cost of regulation." *TK's Video, Inc. v. Denton Cnty., Tex.*, 24 F.3d 705, 710 (1994) (citing *Cox v. New Hampshire*, 312 U.S. 569, 576–77 (1941)), *abrogated on other grounds*, *City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 778 (2004); *accord Int'l Women's Day March*, 619 F.3d at 370. Under this test, courts have approved fees on newsrack permits. *See, e.g.*, *Jacobsen v. Harris*, 869 F.2d at 1174. "[D]istinguishing a proper 'cost of regulation fee' from an impermissible 'flat license tax' is a slippery process." *Fernandes v. Limmer*, 663 F.2d 619, 633 (5th Cir. 1981). Like other content-neutral regulations of speech, fees must be narrowly-tailored. *Horton v. City of Houston*, 179 F.3d 188, 195 (5th Cir. 1999). Showing narrow tailoring is the City's burden. *Int'l Women's Day March*, 619 F.3d at 369 n.31 (citing *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992)). For the City's fee to survive Lauder's First Amendment challenge, it must "demonstrate a link" between the amount of the fee and the costs of enforcement. *Fernandes*, 663 F.2d at 633. There is no requirement that the City recover all of its enforcement costs; a "realistic dent" is enough. *Int'l Women's Day March*, 619 F.3d at 370 (quoting *Horton v. City of Houston*, 179 F.3d 188, 196 (5th Cir. 1999)).

Lauder alleges that the licensing and decal fees are beyond the amounts necessary to defray reasonable administrative costs. (Docket Entry No. 24, ¶ 78). The City has presented uncontroverted evidence that the costs of enforcing the ordinance exceed the permit and application revenues. In response to a question from the City's lawyer about whether the fees "covered your administrative cost for enforcement of the program," Maria Irshad, an employee in the City's Parking Management Division, responded, "No." She explained that she and another Parking

Management Division employee, Carlos Medel, patrol the CBD and send out notices to violators. Medel also testified and elaborated on the costs. He testified that the City purchased a truck with a lift on the back, which it uses to seize noncompliant newsracks as well as for other purposes. He testified that three to five City employees survey newsracks on public rights-of-way to determine compliance. This work, and the seizure of noncompliant racks, often takes place on Saturdays, requiring the City to pay overtime. The employees' testimony was credible. Lauder has offered no evidence in response. The court finds that the revenue collected through application and permit fees does not exceed the City's implementation and enforcement costs.[12]

### D.    Judicial Review

Before trial, this court dismissed Lauder's claim that the ordinance was unconstitutional because it gave City officials too much discretion. The claim that the City had insufficient procedures for judicial review remained.[13] If a provision for judicial review was required, the ordinance would be unconstitutional. It provides an administrative appeal, but makes that appeal process final. After further consideration, this court concludes that the ordinance, as a content-neutral time, place, and manner restriction that does not vest the City with excessive or unbridled discretion, does not require an explicit procedure for judicial review of newsrack application denials.

In *Freedman v. Maryland*, the Supreme Court held that a Maryland law requiring government censors to approve films before their release was constitutional. 380 U.S. 51, 58 (1965).

---

[12]    The fees are in line with those charged by other cities under similar ordinances. *See, e.g.*, BOSTON, MASS., CODE § 16-38.2(f) (requiring yearly payment of $300 plus $25 per newsrack); DALLAS, TEX., CODE OF ORDINANCES § 43-115(a)(3) (requiring $5 per newsrack per year); MIAMI–DADE CNTY., FLA., CODE OF ORD., § 54-266 (requiring $10 per newsrack per year); SAN FRANCISCO, CAL., PUBLIC WORKS CODE 184.12(d)(6) (charging $30 per newsrack per year).

[13]    Lauder has not asserted a due process claim. *See, e.g.*, *Jacobsen*, 869 F.2d at 1174 (considering the plaintiff's argument that his due process rights were violated by removing his newsracks before holding a hearing).

The Court stated that judicial review of official decisions censoring speech under this content-based prior restraint was essential to its constitutionality. "First, any restraint before judicial review occurs can be imposed only for a specified brief period during which the status quo must be maintained; second, prompt judicial review of that decision must be available; and third, the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof in court." *N.W. Enters. Inc. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003) (citing *Freedman*, 380 U.S. at 58–59).

"Until [2002], it was unclear whether the *Freedman* formulation applied to content-neutral permit schemes designed to ensure public safety in a traditional public forum." *Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1260 (10th Cir. 2004) (quoting *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 21 (1st Cir. 2002)). With its decision in *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), "the Supreme Court erased that uncertainty." *Kinton*, 284 F.3d at 21. In *Thomas,* the Court considered a Chicago ordinance that required a permit for certain activities in the city's parks. 534 U.S. at 318–19. Concluding that the factors permitting the parks department to deny a permit were content-neutral, the Court held that "*Freedman* is inapposite because the licensing scheme at issue here is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum." *Id.* at 322. As a result, the ordinance had to "contain adequate standards to guide the official's decision and render it subject to effective judicial review" to pass constitutional muster.

Some courts have interpreted the phrase "subject to effective judicial review" as requiring only sufficient detail to guide decisionmaking and not separate court proceedings. *Granite State Outdoor Adver., Inc. v. City of St. Petersburg, Fla.*, 238 F.3d 1278, 1282 (11th Cir. 2003) ("[W]e are simply required to assess whether the ordinance contains adequate standards to guide official

decisionmaking." (citing *Thomas*, 534 U.S. at 323–24)); *New England Reg'l Council*, 284 F.3d at 21 (quoting only the requirement of "adequate standards to guide the official's decision").  Although the Ninth Circuit has interpreted the phrase as requiring an explicit provision for judicial review, *see Seattle Affiliate of Oct. 22nd Coalition to Stop Police Brutality, Oppression & the Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 800–01 (9th Cir. 2008), that is inconsistent with both the First and Eleventh Circuit reading of *Thomas* as holding that, without narrow, reasonable, and definite standards for issuing permits, a permit, a court cannot effectively review such decisions. The case on which *Thomas* relies, *Niemotko v. Maryland*, 340 U.S. 268 (1951), says nothing about judicial review.  *Thomas*, 534 U.S. at 323.  Instead, *Niemotko* noted that the Court has "condemned statutes and ordinances which required that permits be obtained from local officials as a prerequisite to the use of public places, on the grounds that a license requirement constituted a prior restraint on freedom of speech, press and religion, and, in the absence of narrowly drawn, reasonable and definite standards for the officials to follow, must be invalid."  340 U.S. at 271 (citing cases).  This is consistent with the approach taken in the First and Third Circuits.  Under this approach, *Thomas* does not require a content-neutral time place, and manner restriction such as the ordinance at issue to include an explicit provision for judicial review, if, as here, the ordinance does not give the licensing official "unduly broad discretion in determining whether to grant or deny a permit." *Thomas*, 534 U.S. at 323.

## III.    CONCLUSIONS OF LAW

The City's newsrack ordinance's requirements of 20-gauge or thicker zinc-coated steel and cement bases are narrowly tailored to the City's substantial interests in public safety and aesthetics and leave open ample alternative means of distribution.

41

The fees under the newsrack ordinance are consistent with the First Amendment because they defray the City's administrative costs.

As a content-neutral time, place, and manner restriction that does not leave enforcing officials with unbridled discretion, the newsrack ordinance need not contain an explicit provision for judicial review.

This court rejects Lauder's First Amendment challenges to Houston's newsrack ordinance. Final judgment is entered by separate order.

SIGNED on November 4, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge